Richard Michael McCALL, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 79SC298.

Supreme Court of Colorado,
En Banc.

Feb. 2, 1981.

As Modified on Denial of Rehearing
Feb. 23, 1981.

Peter H. Ney, Littleton, for petitioner.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Robert C. Lehnert, Asst. Atty. Gen., Denver, for respondent.

QUINN, Justice.

We granted certiorari to review the decision of the court of appeals in *People v. McCall*, Colo.App., 603 P.2d 950 (1979), which affirmed the defendant's convictions for first degree murder, section 18–3–102, C.R.S. 1973 (1978 Repl. Vol. 8), and conspiracy to commit that offense, sections 18–2–201 and 18–3–102, C.R.S. 1973 (1978 Repl. Vol. 8). The court of appeals held that neither the Fourth Amendment to the United States Constitution nor Article II, Section 7, of the Colorado Constitution required the police to obtain an arrest warrant before entering the defendant's residence to effect his arrest even in the absence of exigent circumstances, and consequently, the defendant's confession was not suppressible as the product of an unconstitutional arrest. We reverse the judgment of the court of appeals and remand for a new trial.

The convictions arise out of the death of David Raley, a teenage acquaintance of McCall (defendant). The defendant was eighteen years old when Raley was killed. Raley's roommate reported him missing on October 5, 1977. The roommate told the police that he last saw Raley on the prior evening in the company of the defendant and two others, Michael McCarthy and Victor Steenbarger, and that the next day the defendant returned to him Raley's bank

card, keys, and car registration. The defendant at this time told the roommate that Raley had suddenly decided to leave town.

The police suspected that the defendant and his two companions were involved in foul play in the matter of Raley's disappearance. On October 30, 1977, at about 11:45 a. m., Raley's body was found in a remote area of Arapahoe County. The coroner examined the body at this location and, from markings on the neck, determined that death had been caused by strangulation. At approximately 6:30 p. m. that evening a meeting was held by representatives of the Arapahoe County district attorney's office and detectives from various jurisdictions in the county. The purpose of the meeting was to discuss the subsequent course of action against McCall, McCarthy and Steenbarger. The meeting was tape-recorded and discussion centered on how the three suspects might be made to incriminate themselves before they were taken into custody.[1] It was decided that no attempt would be made to obtain an arrest warrant for the suspects, but that a team of sheriff-detectives and police officers would proceed to the defendant's home, where McCarthy also resided as a boarder, and interview them on the pretext that they were witnesses in the homicide case. Another team in the meantime would go to the home of the third suspect, Steenbarger, and carry out a similar scheme.

Several officers proceeded to the defendant's residence, where he lived with his parents, and arrived there shortly after 9:45 p. m. The defendant's mother and father were reserve police officers in the Aurora Police Department and, to facilitate entry into the home, two Aurora police officers accompanied the sheriff-detectives to the front door. The defendant's mother answered the door and, upon the sheriff-detectives identifying themselves, she admitted them inside. The detectives then requested permission to talk to the defendant in a private setting. This request met with initial resistance from the defendant's father. During a verbal exchange between the father and a sheriff-detective, the defendant asked permission of the officers to go downstairs for his eye glasses but permission was refused. The defendant and McCarthy were ordered by a sheriff-detective to sit on a couch in the living room. After being assured that the defendant was not a suspect and was not under arrest, the parents allowed the officers to question the defendant and McCarthy.

1. The following excerpts from the transcript of the October 30, 1977, meeting depict its general tenor:

"[DETECTIVE KLINE]: Detective Arrow says his father is extremely protective of [defendant], so I would suggest you have a warrant before you go to the house if you're trying to arrest him, whoever it is."

\* \* \* \* \* \*

"[DETECTIVE BURGESS]: Arrow has some rapport with McCall. However, he's over-protective and he feels a warrant is (inaudible).

"[DETECTIVE KLINE]: All Detective Randolph says is the same thing.

"[DEPUTY DISTRICT ATTORNEY TOPOLNICKI]: If you decide to go in and arrest him, just say that you want to ask him some questions.

"[DETECTIVE BURGESS]: We can start out that way, but I think we want to get a little heavier (inaudible).

"[DEPUTY DISTRICT ATTORNEY TOPOLNICKI]: OK. But once you are with him and you just ask him those questions, if you feel you got to get heavier if the guy is present, just arrest him and take him out. You don't need a warrant at that point."

The deputy district attorney advised the detectives: "[y]ou wouldn't need any warrants to make your arrests ... I would suggest you not fool with the warrants in that regard ...." The deputy district attorney voiced the opinion that there was "enough probable cause" but that "the officers ... should go in light, not heavy, and just say we just want to talk to you."

\* \* \* \* \* \*

"When I went out to the house, I wouldn't even say they are in custody. I would just say I'm a police officer and we understand that you know an individual by the name of, and do you mind if we come in and ask you a few questions about him; ... can you tell us anything about this? And maybe the guy'll just rap with you. If he does, don't advise him or anything; just sit in his home and rap with him. As long as you're not a uniformed officer he will not feel he is in custody."

The parents at this point were taken to the basement in the company of the Aurora police officers. In order to separate the suspects a sheriff-detective asked the defendant to accompany him outside to a waiting police car. The defendant complied and he was taken to the police vehicle where he was advised orally and in writing of his *Miranda* rights at about 10:05 p. m. Another sheriff-officer joined them and sat in the back seat of the vehicle. The defendant agreed to talk and denied any involvement in the homicide. He was kept in the police vehicle and questioned for approximately forty minutes.

In the meantime Steenbarger was being questioned at his home and made an inculpatory statement which also implicated the defendant. This information was immediately dispatched by radio to the sheriff-detective who had been questioning the defendant in the police vehicle and he was ordered to terminate the interrogation and bring the defendant to the sheriff's office. The sheriff-detective and the defendant arrived at the stationhouse at 11:15 p. m.

The defendant was again interrogated and was advised of Steenbarger's confession. He confessed to his participation in the homicide at about midnight on October 30.

The defendant's parents had never been informed of the removal of their son from the house. When they became aware of this fact they immediately contacted an attorney who in turn spoke to the defendant by telephone after the defendant had already confessed.

After formal charges were filed,[2] the defendant filed a pre-trial motion to suppress his confession.[3] The judge found that the law enforcement officers at their meeting on October 30, 1977, had determined to arrest the defendant without a warrant in his home and thereafter effected that arrest.[4] Noting that the statutory requirement of an arrest warrant when practicable was abolished as of May 20, 1977, the court concluded that the warrantless arrest of the defendant inside his home on October 30, 1977, was based on probable cause and such arrest did not violate the United States or

2. McCarthy and Steenbarger were charged with murder in the first degree and conspiracy to commit murder in the first degree. A severance was granted and the defendant McCall was tried separately.

3. The defendant also asserted that his confession was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court found that he had been fully advised of his *Miranda* rights, that he understood those rights, and that his initial exculpatory statement in the police vehicle and his subsequent confession were not suppressible on this ground.

4. The pertinent findings and conclusions in regard to the arrest were as follows:

"The Court finds that at the meeting two representatives of the District Attorney's Office were there to provide legal advice and that though discussed, it was determined that no attempt should be made to obtain either arrest warrants or search warrants. It appears at the meeting, although no definite statement was made by anyone to that effect, that the defendants were not to be taken into custody immediately, but that if the officers in their judgment determined to do so, that they should arrest the defendants. The Court finds as a fact that all three of the defendants were prime suspects in the homicide under investigation and that it was de-

termined in advance that they were going to be arrested and that the various detectives who had been assigned to the various defendants had determined in their own mind that they were going to place the defendants under arrest. The focus of the investigation had narrowed in on all three of the defendants and there were no other persons either known or suspected by the police officers as being involved, and that none of the police officers believed there was anyone else other than the three defendants involved."

\* \* \* \* \* \*

"The Court concludes as a matter of fact and as a matter of law that the Arapahoe County authorities had determined that the defendant was a prime suspect and that the investigation had focused in on him; that it was determined he was to be arrested in connection with the homicide under investigation.

"Although the exchange between the arresting officer and the parents of the defendant momentarily occupied the sheriff's attention, the Court concludes that the defendant McCall was actually under arrest and not free to leave from the moment that he was told that he was to sit on the couch and stay put and that he was continuously in custody from that time on."

the Colorado constitutions.[5] Accordingly, the defendant's motion to suppress his confession as the product of an unconstitutional arrest was denied.

The confession was admitted during the trial and the defendant appealed his convictions to the court of appeals. In affirming, the court of appeals held that even in the absence of exigent circumstances police officers may effect a warrantless arrest of a defendant inside his home so long as they have probable cause to believe that he committed a crime.

In this proceeding the defendant's principal contention is that his confession was improperly admitted because it was the product of an unlawful warrantless arrest inside his home in violation of the United States Constitution, *U.S.Const.* Amend. IV, and the Colorado Constitution, *Colo.Const.*, Art. II, Sec. 7. He also questions the propriety of certain evidential rulings by the trial court and its failure to instruct the jury on a lesser non-included offense of accessory to murder in the first degree. Because we agree with the defendant's principal contention, it is unnecessary to address these other issues.

## I. *The Warrant Requirement*

Both the trial court and the court of appeals decided the suppression issue prior to the United States Supreme Court's decision in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *Payton* the Supreme Court held that notwithstanding a New York statute authorizing a warrantless arrest inside the home, the Fourth Amendment prohibits warrantless and non-consensual entries into a suspect's home for the purpose of making an

arrest unless exigent circumstances are present. The court remarked that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972), and found persuasive the reasoning articulated by the Second Circuit Court of Appeals in addressing this issue:[6]

"To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present." 445 U.S. at 589, 100 S.Ct. at 1381, 63 L.Ed.2d at 652.

For purposes of the Fourth Amendment any difference in intrusiveness between an entry to search and an entry to arrest is merely a difference of degree rather than one of kind. *Payton v. New York, supra.* Both entries involve the abridgement of house privacy. Since the Fourth Amendment protects against warrantless and nonconsensual searches of a home in the absence of exigent circumstances, the same logic applies to entries to effectuate an arrest. "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. at 590, 100 S.Ct. at 1382, 63 L.Ed.2d at 653.

---

5. The deletion of the warrant requirement is found at Colo.Sess. Laws 1977, ch. 210, 16–3–102(1)(c) at 850.

With respect to the warrant requirement the court ruled that "on May 20, 1977, by conscious and direct act of the legislature the requirement that an arrest warrant should be obtained when practicable was stricken from the law" and that "the law in effect during the time in question requires only that the arresting officer '... has probable cause to believe that an offense was committed ... by the person to be arrested.' " The court concluded that "the matter of the lawfulness of the arrest is a legislative matter, that Article IV of the Constitution is not self-operative and that a legislative determination as to when an arrest can be lawfully made by an officer is not violative of the United States Constitution." The defendant's motion to suppress was based also on Article II, Section 7, of the Colorado Constitution and the court rejected that claim.

6. *United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978), *cert. denied sub nom., Goldsmith v. United States*, 439 U.S. 913, 99 S.Ct. 283–84, 58 L.Ed.2d 259 (1978).

This rule is no stranger to Colorado jurisprudence. In 1971 this court held that although police officers have probable cause to believe a suspect committed a crime, nevertheless they may not enter a private residence to effect an arrest in the absence of exigent circumstances. *People v. Moreno*, 176 Colo. 488, 497, 491 P.2d 575, 580 (1971); *see also People v. Williams*, Colo., 613 P.2d 879 (1980); *People v. Coto*, Colo., 611 P.2d 969 (1980).

■ In the instant case the district court's finding, based on the evidence elicited at the suppression hearing, was that the Arapahoe County law enforcement officers at their meeting on October 30, 1977, determined to arrest the defendant without a warrant at his home even though he was at that time a prime suspect in the homicide. The people and the defendant do not dispute this determination. Nor do they contest the court's conclusion that probable cause existed for the defendant's arrest and the further conclusion that the defendant's arrest took place inside his residence. The only bases that conceivably could furnish a constitutional justification for the defendant's warrantless arrest in his home are exigent circumstances or consent.

## II. *Exigent Circumstances*

■ *Payton* recognized that felony arrests inside the home, based on probable cause, lawfully may be made under exigent circumstances. The doctrine of exigent circumstances encompasses those situations where, due to an emergency, the compelling need for immediate police action militates against the strict adherence to the warrant requirement. *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), furnishes the suitable benchmark for application of the doctrine. In that case police officers, who were reliably informed that an armed robbery had just taken place and that the perpetrator had entered a certain house a few minutes earlier, entered the house in order to search for and arrest the offender. In upholding the propriety of the entry the Supreme Court noted that the exigencies of the situation made the chosen course of conduct imperative:

"The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." 387 U.S. at 298–99, 87 S.Ct. at 1646, 18 L.Ed.2d at 787.

■ Exigent circumstances justifying a warrantless arrest generally have been limited to those situations involving a *bona fide* pursuit of a fleeing suspect, *e. g., Warden v. Hayden, supra; United States v. Scott*, 520 F.2d 697 (9th Cir. 1975), *cert. denied*, 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976), or the risk of immediate destruction of evidence, *e. g., United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *People v. Williams*, Colo., 613 P.2d 879 (1980), or a colorable claim of emergency threatening the life or safety of another, *e. g., People v. Amato*, 193 Colo. 57, 562 P.2d 422 (1977). The scope of the doctrine, however, must be "strictly circumscribed by the exigencies which justify its initiation," *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, 300 (1978), quoting *Terry v. Ohio*, 392 U.S. 4, 25–26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889, 908 (1968), and the burden is on the prosecution to establish that those exigencies render the warrantless entry truly imperative. *E. g., Mincey v. Arizona, supra; Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Warden v. Hayden, supra; Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

■ In this case the prosecution did not attempt to justify their failure to obtain a warrant on the basis of an emergency. A period of 25 days had elapsed between the reported disappearance of the victim on October 5, 1977, and the decision to arrest the defendant in his home on October 30, 1977.

There is no indication of any attempted flight by the defendant during this interval, nor is there any demonstration that the loss or destruction of crucial evidence was imminent. In fact, the officers were confident that the defendant would be at his home when the plan to arrest him was put into operation. The record bespeaks a conscious decision by law enforcement officials to forego an arrest warrant, not because of any emergency, but to cajole the defendant into making an incriminating statement. The court of appeals acknowledged that exigent circumstances were not involved here when it based its approval of the "warrantless non-exigent arrest" on the statutory repeal of that language in section 16–3–102(1)(c), C.R.S. 1973, which required an arrest warrant "when practicable." In short, the record is devoid of evidence establishing the type of urgency contemplated by the exigent circumstances doctrine.

### III. Consent to Arrest

 Similarly, the record offers no basis to sustain the warrantless entry and arrest on grounds of consent. A voluntary consent by an occupant of premises authorizing entry by the police for the purpose of effecting an arrest inside the home may constitute, under appropriate circumstances, a valid waiver of the warrant requirement. See, e. g., United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Coolidge v. New Hampshire, supra; People v. Torand, Colo., 622 P.2d 562 (1981); People v. Billington, 191 Colo. 323, 552 P.2d 500 (1976). However, no such consent was extended to the police in this case.

 The sheriff-detectives deceived the defendant's parents into believing that their purpose in being there was to question the defendant as a witness. It was on the basis of this deception that they were allowed to enter and remain. Once inside the house, they proceeded to carry out their plan of incriminating interrogation, arrested the defendant inside the house, and then spirited him away unbeknown to his mother and father. Where, as here, entry into the home is gained by a preconceived deception

as to purpose, consent in the constitutional sense is lacking. See, e. g., Graves v. Beto, 424 F.2d 524 (5th Cir. 1970), cert. denied, 400 U.S. 960, 91 S.Ct. 353, 27 L.Ed.2d 269 (1970); Alexander v. State, 390 F.2d 101 (5th Cir. 1968); United States v. Reckis, 119 F.Supp. 687 (D.Mass.1954); Commonwealth v. Wright, 411 Pa. 81, 190 A.2d 709 (1963).

### IV. The Derivative Evidence Rule

Having determined that the defendant was subjected to an unconstitutional arrest, the remaining question is whether his subsequent confession should have been suppressed as the product of that illegality. We conclude that the defendant's confession must be suppressed upon retrial of this case.

 Where a confession has been obtained by the exploitation of an initial unconstitutional arrest, the confession prima facie is inadmissible as the fruit of the constitutional violation. E. g., Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); People v. Saiz, Colo., 620 P.2d 15 (1980); People v. Lowe, Colo., 616 P.2d 118 (1980); People v. Moreno, 176 Colo. 488, 491 P.2d 575 (1971). However, if the confession has been obtained by means sufficiently distinguishable from the prior illegality, it may be admissible. E. g., Wong Sun v. United States, supra. The prosecution in such a case must establish that the confession was so removed from the prior illegal arrest that the effect of the initial unconstitutional violation has been sufficiently dispelled by intervening events. E. g., United States v. Ceccolini, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); People v. Corbett, 190 Colo. 388, 547 P.2d 1264 (1976).

 Breaking the causal chain requires a showing that the confession not only meets constitutional standards of voluntariness but also is "sufficiently an act of free will to purge the primary taint" of the illegal arrest. Brown v. Illinois, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416, 426 (1975); People v. Hillyard, 197 Colo. 83, 589 P.2d 939 (1979). Miranda warnings, by

themselves, are not sufficient to dissipate the taint of the unconstitutional arrest. *Brown v. Illinois, supra; People v. Lowe, supra; People v. Corbett, supra.* Were it otherwise the salutary purpose of the exclusionary rule in deterring official misconduct would be nullified:

> "Arrests made without warrant or without probable cause, for questioning or 'investigation', would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all', and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.'" *Brown v. Illinois*, 422 U.S. at 602–03, 95 S.Ct. at 2261, 45 L.Ed.2d at 426.

Thus, while the *Miranda* advisement is an important factor in determining whether a confession is the product of an unlawful arrest, there are other factors relevant to this determination, such as the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of any official misconduct. *Brown v. Illinois*, 422 U.S. at 602–03, 95 S.Ct. at 2261–62, 45 L.Ed.2d at 427; *People v. Corbett, supra.*

■ The temporal proximity between the illegal arrest and the defendant's confession is glaring. The arrest took place shortly after the officers arrived at the home at 9:45 p. m. and the confession was given not later than midnight on that same evening. During this interval the defendant was in continuous police custody and subjected to intermittent interrogation.

The absence of any ameliorating circumstances intervening between the arrest and the confession is equally pronounced. From his arrest to his confession the defendant had little, if any, opportunity for reflection and was without the benefit of legal and parental advice. It was only after he had confessed that his attorney was able to make telephone contact with him, whereup-on he acted on his attorney's advice and made no further statement.

Finally, the evidence depicts a deliberate choice on the part of law enforcement officials to exercise deception in gaining entry into the defendant's home and to employ trickery in their efforts to extract an incriminating statement from him. This type of official misconduct belies any legitimate claim to exemption from the sanctions of the exclusionary rule. The governmental impropriety intruded so severely on the interests protected by the Fourth Amendment as necessarily to trigger the full safeguards of the poisonous tree doctrine. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *People v. Corbett, supra.*

Because the record unequivocally establishes a straight, short and unbroken line from the defendant's arrest to his confession, and the evidence is not susceptible of alternative inferences in this respect, the judgment is reversed. The cause is returned to the court of appeals with directions to remand the case to the district court for a new trial.