The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Norris JONES, Defendant–Appellee.

No. 91SA304.

Supreme Court of Colorado, En Banc.

April 27, 1992.

Norman S. Early, Jr., Dist. Atty., Nathan B. Coats, Chief Appellate Deputy Dist. Atty., Leslie C. Hansen, Deputy Dist. Atty., Denver, for plaintiff-appellant.

David F. Vela, Colorado State Public Defender, Sunwolf, Deputy State Public Defender, Lauren Cleaver, Deputy State Public Defender, Denver, for defendant-appellee.

Justice MULLARKEY delivered the Opinion of the Court.

The People, pursuant to C.A.R. 4.1, appeal the district court's ruling suppressing a videotaped confession and physical evidence on the grounds that they were the product of an illegal arrest. The People do not challenge the suppression of an earlier, unrecorded confession. Conceding that the defendant was illegally arrested and that the first confession was properly suppressed, the People argue that the circumstances surrounding the second, videotaped confession were sufficient to attenuate the taint of the illegal arrest and to permit the admission of the videotaped confession and the murder weapon. We affirm.

I.

Detectives DeMott and DeSanti reported to a Denver apartment in response to a homicide call. When they arrived at the

scene, they discovered the body of the victim lying on a fold-out bed, dressed only in boxer shorts. The victim had died as a result of being beaten repeatedly on the head.

The detectives and crime laboratory crew searched the scene. Detective DeMott observed a blood stain on a stair rail which was located outside of the apartment, but inside the apartment building, and gave orders for the laboratory crew to lift what appeared to be a fingerprint in the blood.

During the search of the scene, the detectives also learned from another officer that the apartment manager had last seen the victim about two weeks earlier. The apartment manager had also stated that he had occasionally seen the victim with a man. The manager had described a black man with teeth problems, whom he had seen on East Colfax listening to a portable stereo and talking to himself. Detective DeMott recognized this description as being that of a man, known to him as "Norris," whom he had also seen several times on East Colfax when he was a patrol officer.

The two detectives, wearing civilian clothes and driving an unmarked car, decided to drive around the East Colfax area to see if they could find "Norris." At approximately 7:00 p.m., the detectives found the man DeMott knew as "Norris" sitting in a restaurant in the area. They approached Norris Jones, who was wearing portable stereo headphones. DeSanti stood to Jones's left, while DeMott stood to Jones's right. DeMott tapped him on the shoulder to get his attention, and the detectives introduced themselves as police officers and asked Jones if they could speak with him. Jones agreed to go downtown with the officers upon their request. However, while still inside the restaurant, Detective DeMott conducted a pat-down search of Jones, who was wearing several layers of clothing, and then handcuffed Jones.

The detectives then led Jones out of the restaurant and placed him in the police car with his hands still cuffed. They drove back to the scene of the crime and asked the apartment manager to identify Jones as the man he had seen with the victim. Following the manager's positive identification of Jones, the detectives took Jones to the police station for questioning.

When they arrived at the police station, the detectives removed the handcuffs from the defendant, asked him for his outer clothing, briefly felt his jackets for weapons and then offered him a seat in one of the offices. Detective DeMott left to get Jones a cup of coffee, while Detective DeSanti checked to see if Jones had a record. At 7:20 p.m. Detective DeMott returned with the coffee and began advising Jones of his *Miranda*[1] rights. DeMott went through a written form which listed the rights and made a check mark next to each right after he read it to Jones. While DeMott read each right, he held the form so that Jones could see it. DeMott then asked the defendant if he understood his rights. The defendant answered, "Yep" and signed the form. Jones then signed the section of the form which indicated that he wished to voluntarily talk to the detective.

Detective DeMott told Jones that he was investigating a homicide and informed Jones of the victim's name. DeMott asked Jones if he had known the victim, to which Jones responded affirmatively. More than once, Jones denied any involvement in the crime. When asked when he had last seen the victim, Jones stated that it had been a couple of weeks. DeMott told the defendant that a fingerprint had been found in some blood on the railing near the homicide scene and that the defendant should tell him his side of the story. The following conversation ensued:

JONES: Well, how do you know I wasn't picking my nose.

DeMOTT: Well, I don't mean that the blood would have been your blood, I mean the blood would have been the blood of the victim.

JONES: Well, I'll go to prison if I tell you—I'll go to jail for murder.

1. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

DeMOTT: Norris, you have to tell us what happened, you have to give us your side of it; otherwise we will never know what your side of the story is.

At that point in the questioning, Jones began to cry and told DeMott that the victim had repeatedly tried to have sex with him, trying to grab him and attempting to remove his clothes, and that Jones had repeatedly pushed the victim away and told the victim that he did not "do this to men." Jones stated that he finally grabbed a hammer and started to strike the victim to keep him away.

Detective DeMott testified that after Jones made the statement about striking the victim with the hammer, DeMott asked Jones if he would allow the detectives to videotape his statement. Jones agreed. DeMott conceded on cross-examination that in making the remark about the fingerprint, he was hoping to elicit an incriminating response from the defendant. DeMott testified that at some point between Jones's first admission and the videotape DeMott learned that no fingerprint had been lifted because there had been insufficient ridges in the print mark to make a fingerprint comparison. However, DeMott did not inform Jones of this fact.

Detective DeMott left the office in which Jones was sitting and informed Detective DeSanti that Jones had confessed. DeSanti told DeMott that there was a warrant out for Jones's arrest for an unpaid fine on a municipal offense although DeSanti had not verified the warrant's existence. The detectives made no mention of the warrant in their reports and did not locate the warrant thereafter.

Approximately fifteen minutes elapsed between the first confession and the videotaped confession. Detective DeMott began the videotaped interview at 7:52 p.m. by rapidly reminding the defendant of his *Miranda* rights. Then Jones repeated the story he told DeMott earlier. During the videotaped confession, Jones described the specific location in which he had placed the hammer. The trial court described the end of the videotaped interview as follows: "Detective DeMott's attempt to elicit con-firmation from the [d]efendant that he had told the [d]efendant he could leave at any time was met with what can be best characterized as a stare of disbelief from the [d]efendant." The second interview ended approximately one hour after the detectives had first approached Jones in the restaurant.

The defendant was charged with first-degree murder in violation of section 18–3–102(1)(a), 8B C.R.S. (1986). Jones pled not guilty, and filed a motion to suppress statements he made to police and a hammer seized by the police on the grounds that all three were products of an illegal arrest. Evidence was presented at the suppression hearing that Jones is mentally handicapped. The district court granted the defendant's motion and suppressed the statements and evidence.

The court concluded that the defendant was arrested without probable cause in violation of his constitutional rights and that the prosecution had failed to prove that the causal chain between this illegal arrest and the defendant's second confession was broken by intervening events. Therefore, the court suppressed the second, videotaped confession, along with the first confession, as part of the primary illegality. In addition, the court suppressed the hammer on the grounds that it would not have been discovered by the police without the defendant's assistance.

## II.

■ The People concede that the arrest was illegal and that the first confession was properly suppressed. However, the People argue that under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the second, videotaped confession by Jones was sufficiently attenuated from the illegal arrest to make it admissible along with the derivative evidence of the hammer. In particular, the People argue that although the time span between Jones's arrest and the confessions was short, the police conduct was not egregious and the discovery of the existence of an outstanding warrant constituted a significant intervening factor.

■ Under the "fruit of the poisonous tree" doctrine, evidence derived from information acquired by the police through unlawful means is not admissible in a criminal prosecution. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; *McCall v. People,* 623 P.2d 397 (Colo.1981); *People v. Saiz,* 620 P.2d 15 (Colo.1980); *People v. Moreno,* 176 Colo. 488, 491 P.2d 575 (1971). However, if the prosecution can show that any connection between official illegality and the prosecution's evidence has "become so attenuated as to dissipate the taint," the evidence will be admissible. *See Wong Sun,* 371 U.S. at 491, 83 S.Ct. at 419 (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939)). With respect to the confession, in particular, "[b]reaking the causal chain requires a showing that the confession not only meets constitutional standards of voluntariness but also is 'sufficiently an act of free will to purge the primary taint' of the illegal arrest." *McCall,* 623 P.2d at 403 (quoting *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975)).

Clearly, the defendant's second confession did not constitute an act of free will sufficient to purge the primary taint of the illegal arrest. Jones's second confession stemmed directly from the first confession which was interrupted by the detective asking Jones if he would repeat the statement on videotape. In fact, only a mere fifteen minutes elapsed between the first and the second confession, during which time the officers prepared the videotape equipment. Further, the circumstances of the illegal arrest did not change between the first and second confession. During that time, Jones was left alone in the same room where he had made his first confession. He did not talk to an attorney, or anyone else, between the two confessions. We hold that because the second confession was closely related in time and by circumstances to his earlier, illegally induced statement, the second confession is inadmissible, despite the fact that *Miranda* warnings were given before the second interview began. *See Brown,* 422 U.S. at 603–604, 95 S.Ct. at 2261–2262; *McCall,*

623 P.2d at 404; *People v. Corbett,* 190 Colo. 388, 547 P.2d 1264 (1976). *Miranda* warnings, in and of themselves, do not break the causal chain between the primary illegality and the secondary evidence of the confession. *See Brown,* 422 U.S. at 597, 95 S.Ct. at 2258; *Corbett,* 190 Colo. at 392–93, 547 P.2d at 1266–67.

■ The prosecution argues that the discovery of the warrant before the second confession, in conjunction with the absence of bad faith conduct by the officers, sufficiently weakened the link between the illegal arrest and the confession. Specifically, the People argue that detention of Jones was justified after the warrant was discovered. The People cite *People v. Thompson,* 793 P.2d 1173 (Colo.1990), and *People v. Gouker,* 665 P.2d 113 (Colo.1983), in support of this argument. Those cases stand for the proposition that an outstanding arrest warrant from another state may provide probable cause to justify a warrantless arrest. In addition, the prosecution relies on *People v. Sosbe,* 789 P.2d 1113 (Colo.1990), in which the police officers initially lacked reasonable grounds to stop the defendant in his car when they began following him, but acquired reasonable grounds when they observed the defendant speeding.

We conclude that the cases cited by the People are inapposite to the present case because the officers in those cases acquired the appropriate grounds to stop or arrest the defendant before they did so. In the warrant cases, the officers relied on the existence of a *facially valid* outstanding warrant to arrest the defendant. *See Gouker,* 665 P.2d at 117. In *Sosbe,* the officers had reasonable and articulable grounds to stop the defendant based on his conduct in speeding. On the other hand, the interrogating officer in this case did not learn of the warrant until after the defendant had already made his first confession. The detectives chose to forego verification of the warrant altogether and did not rely on its existence in engaging Jones in the second interrogation which had been arranged by Detective DeMott before he became aware of the possible warrant.

We agree with the district court's conclusion that the existence of this unverified warrant, of which the defendant had not been informed, did not contribute to the defendant's ability to exercise his free will. In fact, the evidence supports the conclusion that the defendant's confession did not constitute an act of free will. Thus, the existence of the warrant did not constitute an intervening factor sufficient to remove the taint from the derivative evidence. *See McCall*, 623 P.2d at 403.

### III.

Because no significant intervening factor existed to attenuate the evidence from the illegal arrest, we conclude that the confession should be suppressed as "fruit of the poisonous tree." Likewise, the hammer, which was discovered solely through the defendant's statements, also must be suppressed as part of the primary illegality. Accordingly, we affirm the trial court's suppression of the videotaped confession and the hammer.