The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Scott E. SCHAFER, Defendant–Appellee.

No. 97SA142.

Supreme Court of Colorado, En Banc.

Sept. 15, 1997.

Michael F. Green, District Attorney, Twenty–Second Judicial District, Cortez, for Plaintiff–Appellant.

David F. Vela, Colorado State Public Defender, William Herringer, Deputy State Public Defender, Durango, for Defendant–Appellee.

Justice HOBBS delivered the opinion of the court.

This interlocutory appeal is brought by the prosecution, pursuant to section 16–12–102(2), 8A C.R.S. (1996 Supp.), and C.A.R. 4.1, from an order of the Montezuma County District Court granting the motion of defendant Scott E. Schafer (Schafer) to suppress evidence discovered as the result of a warrantless search of his tent and backpack. The District Attorney for the Twenty–Second Judicial District contends that the order should be reversed because Schafer lacked standing to challenge the search, or, alternatively, because exigent circumstances obviated the need for a search warrant. We affirm the district court's suppression ruling.

I.

On the morning of October 19, 1996, at approximately 10:00 a.m., an armed robbery took place at the Chief One Stop convenience store in Cortez, Colorado. The clerk reported that the robber had fled the store on foot, heading east. Cortez police officers arrived at the scene and began to search the area based on the store clerk's description of the perpetrator. The police were informed by a friend of the clerk that a "transient" was camping in a tent behind Stromstead's Restaurant, about a half mile east of the Chief One Stop. Two police officers proceeded to the location of the tent, where they were joined by two other officers.

The district court found that the tent was standing on vacant land that was "junky, with broken glass, trash, and many dirt tracks/roads." Although the land was privately owned, it was publicly accessible and used by townspeople for parties. There were no fences or signs prohibiting entry onto the land. Schafer owned the tent and personal items therein, including the backpack.[1] Schafer was not present when the police officers arrived or at any time during the ensuing search. The flaps of the tent were closed and the entrance was zippered shut. The officers did not have a search warrant.

One of the officers opened the flaps and zipper and entered the tent, where he found clothes, a bedroll, and a backpack. The officer opened the backpack, removed an address book, and copied the name "Scott Robert Schafer" from an envelope therein.[2] He

---

1. The two-person sized tent and its contents were described by Schafer at the suppression hearing:

Q: Okay. Whose tent is that?
A: It's my tent.
Q: And—how were you using it?
A: As a place to live while I was passing through the area.
Q: ... [W]as it you who put it there when it was there on the morning of October 19th, 1996?
A: Yes, I did.
Q: When did you put it there?
A: The night of the 18th.
Q: Okay. And did you leave the tent in that area at any time after you had set it up?
A: Yes, in the morning on the—of the 19th I took off and went and had some breakfast and did a few things around town before I packed up and left for Montrose.
Q: Okay. Before you left the tent, what did you do to it?
A: I set it up and put everything inside.

Q: Okay. And around what time did you get back to the tent?
A: Oh, it was probably around—12:00, 12:30, 1:00 o'clock somewhere around in that area.
Q: What did you do when you got back to the tent?
A: I was getting ready to take off, go back to Montrose, so I opened up the tent and found everything was ransacked.
Q: What property did you have inside the tent?
A: I had two or three pairs of clothing, change of clothing. I had an address book. A day planner is what they call them I guess. And my packsack (sic). Sleeping bag. Pair of tennis shoes was in there too. Personal items in the packsack.
Q: Was the packsack closed?
A: Yes, it was.

2. There is some confusion in the testimony as to whether the name on the envelope was that of Schafer or his brother. Either way, the name

then returned the address book to the backpack, and the officers left without removing any object from the scene.

Several months later, following a domestic violence complaint, Schafer was arrested in Montrose, Colorado for possession of a weapon which had been stolen in Montezuma County, in which Cortez is located. The police included Schafer's photograph in a photo lineup that was transmitted to Cortez. The clerk of the Chief One Stop identified Schafer as the person who robbed the store on October 19, 1996. Thereafter, Schafer was charged with aggravated robbery, in violation of section 18–4–302, 8B C.R.S. (1986), and carrying a concealed weapon, in violation of section 18–12–105, 8B C.R.S. (1986). Prior to trial, Schafer moved to exclude testimony and other evidence based on the warrantless search of his tent and backpack on October 19 in Cortez. The district court granted the motion for suppression, finding that "[Schafer] closed the tent and his knapsack. He clearly had a reasonable expectation that they would remain in that condition." The court further held that

> [n]o exigent circumstances existed for a search without a warrant, as the police were unaware of any connection between the occupant of the tent and the robbery for several months. Therefore there was no basis presented by the evidence to enter the tent, examine its contents and write down information.

The district attorney then brought this appeal, challenging Schafer's standing to raise the constitutionality of the search and asserting that exigent circumstances justified the warrantless entry and search. We uphold the district court's suppression order.

could be used to link Schafer to the tent and place him in Cortez at the time of the robbery.

**3.** The Fourth Amendment to the United States Constitution provides:
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## II.

■ We determine under the Fourth Amendment of the United States Constitution and its Colorado counterpart, Colo. Const. art. II, § 7,[3] that a person camping in Colorado on unimproved and apparently unused land that is not fenced or posted against trespassing, and in the absence of personal notice against trespass, has a reasonable expectation of privacy in a tent used for habitation and personal effects therein.

### A.

#### *Standing*

■ The prosecution first contends that the district court erred in recognizing Schafer's standing to contest the search of the tent and backpack. In order to assert a Fourth Amendment violation, a defendant must show that he or she had "a legitimate expectation of privacy in the areas searched or the items seized." *People v. Naranjo*, 686 P.2d 1343, 1345 (Colo.1984). Whether a person has a legitimate expectation of privacy in a particular place or object is determined by considering the totality of the circumstances, including "whether an individual has a possessory or proprietary interest in the areas or items which are the subject of the search." *Id.*

■ The prosecution observes that "[a] defendant who does not reside on the premises, had no right to be on the premises, and does not have a possessory interest in the premises is not an aggrieved person and cannot complain of the unlawfulness of a search." *People v. Juarez*, 770 P.2d 1286, 1289 (Colo.1989). However, *Juarez* does not apply for two reasons. First, Schafer owned the tent and the backpack and was using the tent for an overnight stay. Second, a posses-

Article II, section 7 of the Colorado Constitution provides:
> The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place or seize any person or things shall issue without describing the place to be searched, or the person or thing to be seized, as near as may be, nor without probable cause, supported by oath or affirmation reduced to writing.

sory interest in the premises "may be established by one lawfully in possession at the time of the search, or by one reasonably believing he has a ... colorable interest in the premises or vehicle." *People v. Pearson*, 190 Colo. 313, 319, 546 P.2d 1259, 1264 (1976).

In Colorado, one who enters or remains upon unimproved and apparently unused land, which is neither fenced nor otherwise enclosed in a manner designed to exclude intruders, does so with license and privilege in the absence of personal or posted notice. Section 18–4–201(3), 8B C.R.S. (1986), provides:

> Except as is otherwise provided in section 33–6–116(1), C.R.S., a person who enters or remains upon unimproved and apparently unused land which is neither fenced nor otherwise enclosed in a manner designed to exclude intruders does so with license and privilege unless notice against trespass is personally communicated to him by the owner of the land or some other authorized person or unless notice forbidding entry is given by posting with signs at intervals of not more than four hundred forty yards or, if there is a readily identifiable entrance to the land, by posting with signs at such entrance to the private land or the forbidden part of the land.

Schafer was given no notice that he was trespassing on private land or that the owner thereof intended to exclude the public. Accordingly, he enjoyed "license and privilege" to enter, was in lawful possession of the tent and the personal effects therein, and has standing to contest the search.

4. Description of Colorado's natural beauty has often included its quickly changing weather:

> Being out-of-doors is a basic part of Colorado. Climate makes the landscape visceral, where the skin, not the eyes, is the primary mode of perception. You feel the heat of the sun or the bite of the wind on your face; winter wets and chills you to the core. Western weather changes rapidly; it is typically unpredictable. Sun-filled skies become thick with thunderclouds, gentle snows change to blizzards, a dry wash is inundated by a flash flood, sweltering heat turns to freezing temperature in hours.

## B.

### *Tents As Habitation*

The Fourth Amendment to the United States Constitution and its Colorado counterpart are intended to protect from unreasonable governmental intrusion one's legitimate expectation of privacy. *See People v. Oates*, 698 P.2d 811, 814 (Colo.1985). The highest protection is afforded to one's residence; a search thereof without a warrant is presumptively unreasonable. *See People v. O'Hearn*, 931 P.2d 1168, 1173 (1997). In determining whether Schafer had a reasonable expectation of privacy in his tent, we take notice that tents have long been utilized as temporary or longer term habitation in Colorado and the West.

Carved out of the public domain secured to the United States by the Louisiana Purchase and the Treaty of Guadalupe Hidalgo, *see* Charles F. Wilkinson, *Crossing the Next Meridian* 34 (1992), thirty-seven percent of Colorado remains in federal ownership, consisting primarily of Bureau of Land Management, Forest Service, National Park, and National Monument lands which are widely available for hiking, hunting, fishing, rafting, wildlife watching, and tent camping. Mel Griffiths & Lynnell Rubright, *Colorado* 161 (1983). Colorado's twenty-four federally designated wilderness areas, *see Sierra Club v. Yeutter*, 911 F.2d 1405 (10th Cir.1990), are accessed solely by foot or horseback, usually for multi-day treks utilizing tents as the predominant mode of shelter. Colorado state parks, federal lands, and some private lands offer opportunities for long term camping as well as overnight or weekend visits. Because wind, hail, rain, or snow may strike without warning any day of the year, particularly in the mountains,[4] the typical and pru-

> Captain John Bell in 1820 spoke of clouds filled with "electric fluid," and John C. Fremont remarked on entering "the storehouse of the thunderstorms." William Parsons, part of the Lawrence Party in 1858, said: "We had a thunder shower almost each day while we remained in the camp—and SUCH thunder as no other country ever saw. On such occasions it seemed as if the old mountain rocked to its very base. The lightning, as if let loose for holiday pastime, played among the deep gorges and rocky canons of the mountains with appalling splendor." The climate is volatile and

dent outdoor habitation in Colorado for over-night or extended stay is the tent.

Tents have long served humans as a form of habitation in Colorado and the West. Lewis and Clark, their interpreter Charbonneau, his wife Sacajawea, and their child shared a tent of dressed buffalo skins as they traveled from Fort Mandan to the Rocky Mountains in search of a passage to the Pacific Coast:

> This tent is in the Indian stile, formed of a number of dressed Buffaloe skins sewed together with sinues. It is cut in such manner that when foalded double it forms the quarter of a circle, and is left open at one side here it may be attatched or loosened at pleasure by strings which are sewed to its sides for the purpose.

*The Journals of Lewis and Clark* 92 (Bernard DeVoto ed., 1953)(entry of April 7, 1805).

The twenty-one member expedition of 1820 led by Major Stephen Long up the Platte River to the Continental Divide in Colorado was housed by means of "three tents, sufficiently large to shelter all our party . . . from the storm." *From Pittsburgh To The Rocky Mountains, Major Stephen Long's Expedition 1819–1820* 150–151 (Maxine Benson ed., 1988)(journal account of the Long Expedition compiled by Edwin James, entry of June 1, 1820). Long's report to Congress included a watercolor by Samuel Seymour depicting the expedition's tents, and another by T.R. Peale illustrating the conical-shaped hide lodges inhabited by the Otos, a Native American tribe they encountered on their journey of exploration.

Canvas tents sheltered surveyor/mapmaker Dr. Ferdinand V. Hayden and his party during four field seasons of the early 1870s in their preparation of the first Colorado Atlas.[5] Richard A. Bartlett, *Great Surveys Of The American West* 40, 80, and accompanying photographs (1962). When Red Mountain Town caught fire on August 12, 1892, canvas tents sheltered the homeless. Robert L. Brown, *An Empire Of Silver* 244 and accompanying photograph (1965).

From September of 1913 to April of 1914, coal miners and their families, approximately nine hundred persons, lived in labor union tents at Ludlow across the railroad tracks from three Colorado National Guard tents housing twelve troopers during the coal field strike. George S. McGovern & Leonard F. Guttridge, *The Great Coalfield War* 210–11, 213 and accompanying photographs (1972). The tent colony burned to the ground during the fatal conflict of Easter 1914 between the Guard and striking miners. *Id.* at 224–25. Seeking refuge from bullets, women and children suffocated in pits to which they had retreated underneath the tents.[6] *Id.* at 226–227.

"Your Wilderness Home" proclaims the Scout Field Book through a chapter title followed by text which identifies the "ideal camp site" as being located "on the outskirts of a clearing in the forest. The trees give you *shelter* against the wind if you pitch your tents so that they are protected from the North and West." James E. West & William Hillcourt, *Scout Field Book, Boy Scouts of America* 143 (1948). Today, wilderness trekkers, families car-camping for the weekend, and many travelers passing through Colorado, make tents their home away from home.[7]

---

violent: chinooks, avalanches, floods, lightning, hail, brutal sun. An 1875 summer hailstorm broke windows in railroad cars and made steel boilers look like they had smallpox. During a storm in the summer of 1990, thousands of Denver automobiles became pockmarked in a single ten-minute burst of pellets. The National Hail Research Experiment has its field headquarters located near Grover, Colorado.
Kenneth I. Helphand, *Colorado Visions of an American Landscape* 29–30 (1991).

5. "More than any other explorer or survey leader, Hayden dramatized the West as a wonderland—a paradise for tourists. He created 'the

Tourist's West.'" William H. Goetzmann, *New Lands, New Men, America and the Second Great Age of Discovery* 411 (1986).

6. Five miners, one militiaman, two women, and eleven children died at Ludlow that day. Carl Ubbelohde, et al., *A Colorado History* 256 (rev. ed. 1976).

7. The attraction of Colorado has included tourism and health since before statehood, which occurred in 1876:

> Although the promoters of Colorado played down the lack of rainfall, frequently denied that the Great American Desert extended so far

## C.

### *Reasonable Expectation of Privacy*

■ The Fourth Amendment "protects people, not places. What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Whether pitched on vacant open land or in a crowded campground, a tent screens the inhabitant therein from public view. Though it cannot be secured by a deadbolt and can be entered by those who respect not others, the thin walls of a tent nonetheless are notice of its occupant's claim to privacy unless consent to enter be asked and given. One should be free to depart the campsite for the day's adventure without fear of this expectation of privacy being violated. Whether of short or longer term duration, one's occupation of a tent is entitled to equivalent protection from unreasonable government intrusion as that afforded to homes or hotel rooms. *See United States v. Gooch,* 6 F.3d 673, 677 (9th Cir.1993) (reasonable expectation of privacy existed for tent on state campground); *Alward v. State,* 112 Nev. 141, 912 P.2d 243, 249 (1996) (person has reasonable expectation of privacy in tent while camping on BLM land).

■ An integral facet of Colorado's economy and allure is recreational tourism. Visitors and residents of Colorado who choose to stay in a hotel room, cabin, or tent away from their permanent abode presumptively enjoy Fourth Amendment protection. "A guest in Yellowstone Lodge, a hotel on government park land, would have no less reasonable an expectation of privacy in his hotel room than a guest in a private hotel, and the same logic would extend to a campsite when the opportunity is extended to spend the night." *Gooch,* 6 F.3d at 678. The scenic and historic town of Cortez, the gateway to Mesa Verde National Park and the locus of this case, depends significantly on visitation to Southwestern Colorado and the Four Corners region.

■ Ordinarily, a person who occupies land as a trespasser, or a person who should anticipate under the circumstances that privacy cannot reasonably be expected, does not justifiably rely upon the Fourth Amendment. *See United States v. Ruckman,* 806 F.2d 1471, 1473 (10th Cir.1986) (person occupying natural cave on federal land does not have reasonable expectation of privacy); *State v. Mooney,* 218 Conn. 85, 588 A.2d 145, 153 (1991) (presuming that space under a bridge abutment owned by state transportation department cannot be considered one's home).

■ Here, the district court found that Schafer was not in trespass because he was using his tent for camping on unimproved, publicly accessible land which was neither fenced nor posted, and he enjoyed a license or privilege to do so. The land was often used by local youth for parties and bore no indication that it was not available for camping, despite its rough appearance. Schafer had spent the previous night in the tent. There was no basis for the police officers to reasonably believe that the tent and the personal effects therein had been abandoned by their owner.

The officers conducting the entry and search relied solely on the characterization spoken to them by a friend of the robbery victim that a "transient" was camping on land behind the restaurant. No description or other identifying information tied the robber to the inhabitant of the tent. Without a warrant, the officers nevertheless unzipped the tent, opened the backpack, extracted the notebook, and recorded information contained on an envelope therein.

■ The prosecution informed the trial court that it intended to offer this information "as circumstantial evidence that [Schafer] was in town at the time" of the robbery. This it may not do. The district court was

west, and emphasized the possibilities of irrigation when addressing themselves to prospective settlers, there was one area of the "sell Colorado" program where the lack of humidity was an asset: the field of health and tourism. The Rockies widen in Colorado, dividing into several ranges with high mountain parks between, providing an area, more than half the width of the state, whose high, dry climate earned it the title "The Switzerland of America."

Robert G. Athearn, *The Coloradans* 92 (1976).

correct in excluding testimony and other evidence based on this warrantless search. Schafer was using the tent for camping and had secured it in a closed position. The officers discovered the information they seek to utilize in this regard solely by means of their unauthorized intrusion. The exclusionary rule functions to redress such deprivation of a constitutional right and to deter like official misconduct. *Cf. People v. Shinaut*, 940 P.2d 380, 383 (Colo.1997).

### D.

*Probable Cause and Exigent Circumstances*

■ The prosecution argues that the search was justified by exigent circumstances. Exigent circumstances have been found to support a warrantless search in three situations: where "(1) the police are engaged in a bona fide pursuit of a fleeing suspect, (2) there is a risk of immediate destruction of evidence, or (3) there is a colorable claim of emergency threatening the life or safety of another." *People v. Crawford*, 891 P.2d 255, 258 (Colo.1995).

■ The prosecution asserts that this case fits within the second category, because a tent is readily moveable and the evidence therein can be effectively "destroyed" or removed for law enforcement purposes from the jurisdiction. However, this exception to the warrant requirement demands that the threat of evidence destruction be real and immediate: "[t]he mere fact that evidence is of a type that can be easily destroyed does not, in itself, constitute an exigent circumstance." *People v. Marez*, 916 P.2d 543, 547 (Colo.App.1995). The characteristic mobility of luggage does not justify dispensing with the Warrant Clause. *See United States v. Chadwick*, 433 U.S. 1, 13, 97 S.Ct. 2476, 2484–85, 53 L.Ed.2d 538 (1977).

Here, the danger of evidence destruction was not immediate. The tent and its contents were in existence when the police arrived and would have remained so had surveillance been maintained. Instead, the four police officers chose to search the tent and backpack rather than posting one of them to wait until a person—who might or might not have matched the store clerk's description of the suspect—returned to the tent. The robbery occurred at approximately 10:00 a.m., and the police officers arrived at the tent site soon thereafter. Schafer returned, struck the tent, and left about noon the same day.

Even when exigent circumstances exist, a warrantless search must be based on probable cause. *See People v. Miller*, 773 P.2d 1053, 1057 (Colo.1989). The only link between the convenience store robbery and the tent was a statement by the victim that the robber had headed east on foot, combined with a statement by her friend that a "transient" was camping behind a local restaurant east of the convenience store. These statements did not establish probable cause to believe that the tent might contain either the suspect or evidence relating to the robbery.

■ The record does not support a finding of probable cause that the suspect might be found inside the tent. We have identified factors which might justify a warrantless search for a suspect as including the following:

(1) a grave offense is involved; (2) the suspect is reasonably believed to be armed; (3) there exists a clear showing of probable cause to believe that the suspect committed the crime; (4) there is a strong reason to believe that the suspect is in the premises being entered; (5) the likelihood exists that the suspect will escape if not swiftly apprehended; and (6) the entry is made peaceably.

*O'Hearn*, 931 P.2d at 1175 (quoting *People v. Miller*, 773 P.2d 1053, 1057 (Colo.1989)).

The police observed no one in the vicinity of Schafer's campsite and they had no reasonable belief that the robbery suspect was the camper or was inside the tent. If the officers had been looking for the suspect, an inquiry to determine the presence of a person, rather than a search of the empty tent and the closed backpack, would have sufficed.

The district court determined that probable cause and exigent circumstances did not exist. We have reviewed the record and ascertain no evidence of their existence. After hearing testimony by five witnesses, the district court found that no facts justified the warrantless search and that Schafer had a

reasonable expectation of privacy in his tent and backpack. These findings are supported by the record and will be upheld. *See People v. D.F.*, 933 P.2d 9, 14 (Colo.1997).

## III.

Accordingly, we affirm the ruling of the district court suppressing testimony and other evidence based upon the warrantless search of Schafer's tent and backpack, and we return the case for further proceedings consistent with this opinion.