The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Robert Lamar LEWIS, Defendant–
Appellee.

No. 98SA336.

Supreme Court of Colorado,
En Banc.

March 22, 1999.

James J. Peters, District Attorney, Eighteenth Judicial District, John Topolnicki, Deputy District Attorney, Richard H. Bloch,

Deputy District Attorney, Englewood, Colorado, Attorneys for Plaintiff–Appellant.

David F. Vela, Colorado State Public Defender, Christopher R. Decker, Deputy State Public Defender, Englewood, Colorado, Attorneys for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

In this interlocutory appeal brought pursuant to C.A.R. 4.1(a), the People urge us to overturn a trial court order suppressing the following: (1) evidence from a motel room as the fruits of several unconstitutional searches, (2) an out-of-court show-up identification by a witness as the fruits of an unconstitutional seizure, and (3) subsequent statements made by the defendant as the fruits of an unconstitutional arrest. Upon review of the trial court's findings and the evidentiary record, we affirm the suppression order.

## I.

On March 22, 1998, at approximately 3:45 a.m., Barbara Fleming and Julie Nelson were working as clerks at a 7–Eleven store in Englewood, Colorado. Fleming was sitting behind the counter inventorying cigarettes and Nelson was standing on the customer side of the counter near the front entrance, when a man entered the otherwise empty store with a gun in his hand. He ordered Fleming to remain where she was and directed Nelson to give him the bills from the cash register. Nelson complied, giving the man bills totaling about $68.00. Before leaving the store, the man also asked Nelson to give him several packs of Newport cigarettes. At the conclusion of this incident, which had lasted only a few minutes, the employees called the police to report the robbery.

Approximately five minutes later, Officer Jones arrived at the scene. Utilizing the employees' descriptions of the robber as a black male wearing a Colorado Rockies hat and a black coat, and armed with a handgun, the Englewood police dispatcher directed officers to report to the scene.

Sergeant Watson responded to the dispatch. After finding no one on the streets in the direction the robber had reportedly fled, Watson decided to stop in at the 4–U Motel, which was located about half a block north of the 7–Eleven on the same side of the street. While en route to the Motel, Watson heard an updated description of the robber, which described him as a man with an athletic build, between six foot one and six foot three inches in height, wearing a Colorado Rockies hat, dark pants and dark coat, and carrying a silver handgun. Upon arriving at the Motel, Watson first awakened the night manager to inquire as to whether anyone meeting this description had rented a room. The manager responded in the negative. However, as Watson returned to his patrol car, he heard voices coming from the motel courtyard and went to investigate. There, from a distance of approximately fifty feet, he noticed a woman standing outside one of the motel rooms, talking to a tall black male inside the room who was wearing dark clothing.[1] At this point, Watson slowly approached the room. After Watson had covered one-third to one-half of the distance to the room, the woman outside the door noticed him approaching and reached in and closed the door of the motel room, while remaining outside the room.

Watson identified himself as a police officer and directed the woman to open the door.[2] As the woman complied with this request, Watson pulled his handgun and held it in a low ready position. From his vantage point outside the door, Watson saw four black males, one of whom was walking out of the bathroom. One white male and two females were also in the room. Watson testified that all four of the black males appeared to him to fit the description of the suspect. All four appeared to be in their mid- to late-twenties, had athletic builds, and were fairly tall. All wore dark clothing except one, later determined to be the defendant, who was shirtless. At that point, about ten minutes had passed from the time Watson received the first dispatch regarding the 7–Eleven robbery. Testimony later established that

---

1. Watson testified that the area in front of the room was a "kind of poorly lit parking lot."

2. Both parties concede that Watson did not obtain consent to enter the motel room.

the defendant and another of the occupants had rented the room.

Watson then directed the woman who had been outside the door to enter the motel room. From his position outside the room with his gun unholstered and pointed downward, Watson directed all the occupants to kneel and interlock their fingers behind their heads. The occupants complied.

Shortly thereafter, additional officers arrived at the Motel. Watson then directed the occupants of the room to exit one at a time, walking backwards with their fingers interlocked behind their heads. As each person left the room, Officer Herriot patted them down for weapons. This pat-down search yielded no weapons. Herriot then turned the occupants over to other officers who directed the occupants to sit down in the motel parking area. The officers gave the shirtless defendant a blue and white jacket to wear outside.

Once the occupants had been removed from the motel room, Watson and several other officers entered the motel room to make sure that no one else remained inside. The officers immediately spotted some Newport cigarettes lying on a dresser and some dark-colored clothing lying on the floor. After one officer checked the bathroom, Watson heard the toilet running as if it had recently been flushed. Watson then proceeded to investigate the noise. After seeing nothing in the toilet bowl, Watson removed the lid of the toilet tank. Inside, Watson found a silver handgun wrapped inside a rag. In addition to this handgun, the officers' initial search of the room also yielded a Colorado Rockies baseball hat and an unspecified number of dollar bills.

Soon after the occupants were removed from the motel room,[3] Jones brought the 7–Eleven employees, one-at-a-time, to the 4–U Motel for a show-up identification in the motel parking lot. The first clerk, Nelson, did not identify the defendant as the robber. However, the second clerk, Fleming, posi-

tively identified the defendant, Robert Lewis, as the robber. Following Fleming's positive identification of the defendant, he was placed under arrest at approximately 4:25 a.m.

After being arrested, Lewis was transported to the police station and placed in a holding cell. Despite the fact that the cell was cold, an officer asked Lewis to remove his shoes and jacket, leaving him shirtless once again. Lewis then fell asleep on the bench of the cell, without a blanket.

Shortly before noon that same day, Lewis was awakened and taken to an interrogation room. Lewis was the last occupant of the room to be interviewed by the police. Notably, none of the interviewees had inculpated Lewis in the robbery.

The trial court found that, when Lewis first appeared in the interview room, he was groggy from sleep and hugging himself in an apparent effort to warm up. However, by the time of his *Miranda* advisement, Lewis was sufficiently alert to understand the advisements, waiver and subsequent questioning. Detective Forington advised Lewis of his *Miranda* rights and obtained Lewis' written acknowledgment that he understood them. The Detective then asked Lewis if he wished to waive those rights and speak to him about the robbery at the 7–Eleven. Lewis agreed and acknowledged the waiver in writing.

When asked to explain what had occurred the preceding night, Lewis denied having had any knowledge of the robbery. After the officers provided Lewis with a blanket because he appeared cold, he again denied any involvement. During the interview, Forington told Lewis that the 7–Eleven surveillance tape showed Lewis committing the robbery.[4] Forington repeated this misrepresentation nineteen times during the course of the interview. Forington also told Lewis that one of the clerks had identified him as the robber. Eventually, Lewis gave a statement admitting that he was the robber and detailing the

---

3. Watson testified that either right before or right after his search of the bathroom, he asked Herriot to bring the 7–Eleven clerks down to see whether any of the motel room occupants could be identified as suspects.

4. Prior to the interrogation, Detective Forington reviewed the surveillance tape from the 7–Eleven several times; however, the face of the robber was not visible on the tape.

manner in which he and another had committed the robbery and divided the proceeds.

Hours after Lewis' arrest, at about noon, another detective returned to the motel room in order to "make sure ... it was searched thoroughly." However, the detective had no warrant for this second search. According to this detective's testimony "everything was pulled apart" during the course of this search. When she moved the dresser in the room, she found $376.00 hidden underneath it.

Lewis was subsequently charged with two counts of aggravated robbery,[5] conspiracy to commit aggravated robbery,[6] possession of a weapon by a previous offender,[7] criminal impersonation,[8] mandatory sentencing for a crime of violence-deadly weapon,[9] and two counts as a habitual criminal.[10]

On May 6, 1998, Lewis filed motions to suppress the tangible evidence seized from his motel room, the out-of-court identification by Fleming, and the statements he made during the course of the interrogation. On July 15 and 16, 1998, the trial court held a hearing to review the defendant's motions and heard testimony from the officers and detectives involved, as well as from the two clerks and the defendant.

On July 31, 1998, the court entered an order finding that Watson lacked the probable cause necessary to justify his warrantless entry into the motel room. Accordingly, the trial court suppressed the evidence seized during the various searches of the motel room. The court also suppressed Fleming's out-of-court identification of the defendant after finding that it was derived from the defendant's illegal seizure and, thus, was inadmissible as a fruit of the poisonous tree. Finally, the trial court suppressed Lewis' stationhouse statements. Although it found that Lewis made these statements voluntarily, the trial court held that they were inadmissible as fruits of an illegal arrest because the attenuation doctrine was inapplicable to the facts of this case.

The People raise five questions for review: (1) whether the trial court erred in ruling that neither probable cause nor exigent circumstances were present to justify the arrest of the occupants of the motel room and the search of same; (2) whether reasonable suspicion justified the detention of the occupants of the motel room and the several searches of the room; (3) whether the searches of the motel room were valid as searches incident to arrest; (4) whether the trial court erred in suppressing the identification of the defendant by Fleming at the 4–U Motel; (5) whether the statements made by the defendant during his interrogation were sufficiently attenuated so as not to be considered fruits of the poisonous tree.

## II.

We first consider whether the police had probable cause to search the motel room, and seize the defendant and various items found therein.

### A. Probable Cause and Exigent Circumstances

The Fourth Amendment and its Colorado counterpart protect citizens from unreasonable governmental intrusion into their homes. *See Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *People v. O'Hearn,* 931 P.2d 1168, 1173 (Colo. 1997). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton,* 445 U.S. at 586, 100 S.Ct. 1371 (citation omitted).

▬ The principal protection for citizens against governmental intrusion into their homes is the requirement that a warrant be based on probable cause to search or arrest. *See Welsh v. Wisconsin,* 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984);

5. § 18–4–302(1)(b), 6 C.R.S. (1998).

6. § 18–2–201, 6 C.R.S. (1998).

7. § 18–12–108(2)(c)(I)(II), 6 C.R.S. (1998).

8. § 18–5–113(1)(e), 6 C.R.S. (1998).

9. § 16–11–309, 6 C.R.S. (1998).

10. § 16–13–101, 6 C.R.S. (1998).

*O'Hearn*, 931 P.2d at 1173.[11] More specifically, "[p]robable cause to arrest exists where the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a person in believing that the defendant has committed a crime." *People v. Chavez*, 632 P.2d 574, 579 (Colo.1981); *see also People v. Davis*, 903 P.2d 1, 4 (Colo. 1995) (noting that "[s]uspicion alone does not amount to probable cause"). In the absence of probable cause to believe that a crime has been committed and exigent circumstances necessitating immediate police action, warrantless entry into a home is proscribed. *See Welsh*, 466 U.S. at 749, 104 S.Ct. 2091; *People v. Miller*, 773 P.2d 1053, 1057 (Colo. 1989). The existence of probable cause and exigent circumstances must be determined by evaluating the facts available "at the time of the warrantless entry and search." *People v. Jansen*, 713 P.2d 907, 911 (Colo.1986); *see also People v. Taube*, 864 P.2d 123, 129 (Colo.1993). If the circumstances of a case demonstrate that either probable cause or exigent circumstances were absent, evidence derived from the illegal entry must be suppressed. *See Payton*, 445 U.S. at 587–89, 590, 100 S.Ct. 1371; *accord Taube*, 864 P.2d at 129.

In analyzing the warrantless search of the motel room herein and the subsequent seizure of items from the room, the trial court found that neither probable cause nor exigent circumstances were present which would have justified Sergeant Watson's entry. We agree.

■ At the outset, we note that Watson's warrantless entry into the motel room violated the Fourth Amendment unless either (1) consent or (2) probable cause and exigent circumstances were present under the circumstances of this case. *See, e.g., People v. Hogan*, 649 P.2d 326, 329–30 (Colo.1982); *McCall v. People*, 623 P.2d 397, 402 (Colo. 1981). Notably, the People do not argue that the woman outside the motel room door consented to reopening the door for Watson. In the present case, the trial court relied upon Watson's own candid admission that he had not sought the woman's consent, but instead, had *directed* the woman to open the door.[12] *See O'Hearn*, 931 P.2d at 1173; *People v. Thomas*, 853 P.2d 1147, 1149 (Colo.1993) (noting that prosecution bears burden · of proving by clear and convincing evidence that consent to enter the premises was freely given). As the trial court's factual findings regarding consent are supported by the record, we find that consent was not present here. *See, e.g., Thomas*, 853 P.2d at 1149; *cf. People v. Milton*, 826 P.2d 1282, 1286–87 (Colo.1992) (finding that entry was supported by consent).

■ Absent consent to enter the motel room, the People must show that probable cause and exigent circumstances justified Watson's warrantless entry. In essence, the People claim that Watson's sighting of the man inside the motel room door provided the basis for Watson's alleged probable cause herein. Watson saw a person whose general appearance was consistent with the description of the robber, i.e., a tall black male wearing dark clothing. However, the People themselves concede that the description upon which Watson was acting was "vague." Furthermore, the man. was missing the most distinctive element of the description, i.e., the Rockies hat. In fact, this description was so general as to fit three other persons in this one motel room alone.[13] We find that this

---

**11.** To this end, the Fourth Amendment provides: "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." These rights are applicable to the states through the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Similarly, Article II, section 7 of the Colorado Constitution provides:

> Security of person and property—searches—seizures—warrants. The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and sei-

zures; and no warrant to search any place or seize any person or things shall issue without describing the place to be searched, or the person or thing to be seized, and near as may be, nor without probable cause, supported by oath or affirmation reduced to writing.

**12.** Watson testified that after the woman closed the door, he "instructed her to ... open that door for me, which she did."

**13.** The description fit not only the man in the doorway, but also two other men in the motel room as to their clothing and stature, as well as the defendant as to stature.

general description, taken alone, did not give rise to probable cause for Watson to believe that the man in the doorway was the robber.

▮ The People further argue that, under a totality of the circumstances analysis, probable cause existed not only due to the fact that the man standing inside the motel room door matched the general description of the robber, but also due to the lateness of the hour, the fact that the 7–Eleven was surrounded by the police soon after the robbery, the absence of other persons from the streets in the vicinity, the proximity of the 4–U Motel to the crime scene, and the woman's "furtive gesture" of closing the door to the room upon noticing Watson.

However, even when the foregoing factors are taken together, we find that the police still did not have probable cause to believe that the tall black man inside the motel room door was the man who had robbed the 7–Eleven. With the exception of the description of the robber, which did not give rise to probable cause, none of the factors emphasized by the People gave the officer any additional reason to think that the particular individual in the motel room doorway had committed any crime. Therefore, we hold that Watson's warrantless entry into and search of the motel room was unsupported by probable cause.

▮ The People also argue that exigent circumstances in this case necessitated immediate and warrantless police action. In fact, the People argue that all three recognized general categories of exigency were present in the instant case: (1) "hot pursuit" of a fleeing suspect; (2) a risk of immediate destruction of evidence; and (3) a colorable claim of emergency threatening the life or safety of another. *See, e.g., Miller*, 773 P.2d at 1057.

▮ Given the rapid manner in which the facts of this case unfolded, the People's "hot pursuit" claim arguably carries the most weight of the aforementioned exigencies.[14] The police responded to the 7–Eleven approximately five minutes after the crime and Watson made his initial contact with the occupants of the motel room only ten minutes after the initial call. However, it is important to reemphasize that probable cause is a threshold requirement for the consideration of exigent circumstances. *See, e.g., Payton*, 445 U.S. at 587–591, 100 S.Ct. 1371 (noting that arrest in the home is "simply too substantial an invasion" to allow without exigent circumstances, even "when probable cause is clearly present"). Absent probable cause, Watson had no authority to make a warrantless entry into the motel room.

▮ Even if we had found that probable cause was present here, a review of pertinent case law demonstrates that the facts of this case do not rise to the level of hot pursuit. The People's hot pursuit argument turns on their assertion that Watson was "certainly on the fresh and very recent trail of a person who had committed an armed robbery." However, timing alone is not a sufficient basis for a finding of hot pursuit. A comparison of the facts of the instant case with those of *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the only case upon which the People rely, is illustrative. In *Hayden*, a case involving an armed robbery of a cab company, the suspect was followed to his home by two cab drivers, who later related the defendant's exact location to the police. *See id.* at 297, 87 S.Ct. 1642. The police justified their subsequent warrantless entry into the identified residence as hot pursuit.

14. We find that the People's arguments regarding the other two categories of exigent circumstances are without merit. "In the absence of evidence substantiating the officer's fear of danger or destruction of evidence, a warrantless search of the premises is illegal." *People v. Jansen*, 713 P.2d 907, 911 (Colo.1986); *see also People v. Garcia*, 752 P.2d 570, 581 (Colo.1988) (holding that prosecution must demonstrate that "police had an articulable basis to justify a reasonable belief that evidence was about to be removed or destroyed" in order for the threat of immediate destruction or removal of evidence to constitute an exigent circumstance). There is no evidence that contraband or other evidence was in danger of being destroyed. Similarly, there is no cognizable allegation that anyone was presently being endangered by Lewis. As such, we find that neither a risk of immediate destruction of evidence, nor a colorable claim of emergency threatening the life or safety of another were present in this case.

■ The circumstances that led Watson to the 4–U Motel room are readily distinguishable from those in *Hayden*. In the instant case, neither Watson nor anyone else claimed to have followed Lewis from the 7–Eleven or to have seen him entering the 4–U Motel room. As such, Watson had no reason to believe that the robber was at the 4–U Motel.[15] In order for a warrantless entry to be justified as hot pursuit, the police must have been provided with some sort of direction, whether it be the result of a chase or the result of a tip from a witness, which leads them to a particular premises.[16] *See O'Hearn*, 931 P.2d at 1175 (noting that, among other factors, police must have a "strong reason to believe that the suspect is in the premises being entered" in order to claim exigent circumstances are present); *Miller*, 773 P.2d at 1057 (same); *see also* 3 Wayne R. LaFave, *Search and Seizure* § 6.1(d), at 251–54 (3d ed.1996) (reviewing hot pursuit exigency). Hot pursuit was absent here because Watson's presence at the 4–U Motel was merely the result of happenstance.

In sum, we find that absent probable cause and exigent circumstances, the trial court correctly suppressed the evidence seized as a result of the illegal searches.[17]

### B. *Reasonable Suspicion*

In the alternative, the People argue that Watson's reasonable suspicion of criminal activity in the motel room justified the warrantless entry and the subsequent seizure of evidence. In essence, the prosecution urges this court to extend the investigatory stop doctrine enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to validate warrantless non-consensual entries into motel rooms. *See also Stone v.*

*People*, 174 Colo. 504, 485 P.2d 495 (1971). In furtherance of this argument, the People liken one's privacy interests in a motel room to those in an automobile. *See, e.g., People v. Litchfield*, 918 P.2d 1099 (Colo.1996).

■ As one of the renters of the motel room, Lewis clearly had standing to raise a constitutional challenge to the search. Moreover, it is well-established that, during the period of the rental, the renter of a motel room has a legitimate expectation of privacy in both the room and its contents. *See, e.g., Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *People v. Dumas*, 955 P.2d 60, 63 n. 4 (Colo.1998); *People v. Naranjo*, 686 P.2d 1343, 1345 (Colo. 1984); *see also People v. Schafer*, 946 P.2d 938, 941 (Colo.1997). While Watson's sighting of a man who met the general description of the suspect could have given rise to reasonable suspicion, the existence of reasonable suspicion alone does not provide a legal basis upon which an officer may enter a residence and conduct comprehensive searches and seizures therein. *See, e.g., South Dakota v. Opperman*, 428 U.S. 364, 367, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (recognizing that the "[Supreme] Court has traditionally drawn a distinction between automobiles and homes ... in relation to the Fourth Amendment"); *Terry*, 392 U.S. at 27, 88 S.Ct. 1868 (establishing "a narrowly drawn authority to permit a reasonable search for weapons ... where [the officer] has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest"); *Davis*, 903 P.2d at 4 (noting that "[s]uspicion alone does not amount to probable cause"); *People v. Harris*, 762 P.2d 651, 654 (Colo.1988) (citing *Dunaway v. New York*, 442 U.S. 200, 210, 99

15. Watson testified that he had been to the 4–U Motel in the past and that "[t]here seems like there's people up and about at all hours of the morning, so I went there." Watson further testified that he did not have any reason to believe that there was independent criminal activity afoot at the time he went to investigate the voices he heard in the motel courtyard.

16. While the 7–Eleven employees were able to indicate the general direction in which the robber had fled, this fact is not sufficient to establish hot pursuit. Were we to accept this as a suffi-

cient indicia of exigent circumstances, it could justify warrantless police entry into any residence located in the general direction in which a suspect had fled. Such a result would be untenable.

17. As the prosecution offers no argument that the detective had probable cause when she returned to search the motel room at noon the next day, we uphold the exclusion of evidence seized from the room at that time as well.

S.Ct. 2248, 60 L.Ed.2d 824 (1979), which noted that the "Court has been careful to maintain [*Terry*'s] narrow scope.").

In light of the absence of legal support to validate such an extension of the stop-and-frisk doctrine beyond the narrowly defined intrusions involved in *Terry* and its progeny, we reject this argument.

### III.

Alternatively, the People argue that the seizure of evidence from the motel room was justified as the result of a search incident to arrest. However, the right to conduct a search incident to arrest only applies following a lawful arrest. *See, e.g., United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (noting that "[i]t is the fact of the *lawful* arrest which establishes the authority to [conduct a] search [incident to arrest]") (emphasis added); *People v. Bland*, 884 P.2d 312, 316–18 (Colo.1994) (noting that full search incident to arrest is authorized when police effect lawful custodial arrest and defining custodial arrest as an "officer's seizure of a person for the purpose of taking that person to the stationhouse for booking procedures and the filing of criminal charges"); *People v. Bischofberger*, 724 P.2d 660, 664–65 (Colo.1986); 2 LaFave, *Search and Seizure* § 5.1(a), at 395 (stating that distinction in *Robinson*, 414 U.S. 218, 94 S.Ct. 467, between custodial arrests and arrests followed by release at the scene is important in terms of the incidental search that is allowed).

The facts of the instant case do not satisfy the foregoing legal standard. In light of our finding that the police lacked probable cause, the subsequent arrest of the defendant was not lawful. Moreover, the initial searches of the motel room *preceded* the defendant's arrest by approximately thirty minutes. As such, the searches of the motel room were not valid as searches incident to arrest.

### IV.

The People argue that the trial court erred in suppressing both Fleming's out-of-court identification of the defendant and the defendant's statements at the stationhouse under the "fruit of the poisonous tree" doctrine. Under this doctrine, evidence derived from information acquired by the police through unlawful means is inadmissible in a criminal prosecution. *See Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *People v. Jones*, 828 P.2d 797, 800 (Colo.1992); *McCall*, 623 P.2d at 403. In determining whether evidence must be excluded under this doctrine, we must ask "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407; *see also Hogan*, 649 P.2d at 332.

Significantly, not all evidence is considered to be a "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. *See Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. 407 (declining to establish a "but for" test applicable to the "fruit of the poisonous tree" doctrine). To this end, there are two widely-recognized exceptions to the "fruit of the poisonous tree" doctrine: the independent source exception and the attenuation exception. *See, e.g., Thomas*, 839 P.2d at 1180; *People v. Schoondermark*, 759 P.2d 715, 718 (Colo.1988). The independent source exception allows the admission of evidence obtained as the fruit of an illegal warrantless search or seizure where the Government learned of the evidence "from an independent source." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The attenuation exception allows the admission of evidence obtained as the fruit of an illegal warrantless search or seizure when the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

The People seek to invoke the independent source exception with regard to

Fleming's out-of-court identification and the attenuation exception with regard to the defendant's statements. We note that the trial court's factual findings will not be disturbed on appeal so long as they are supported by competent evidence in the record. *See, e.g., O'Hearn,* 931 P.2d at 1176; *People v. Schrader,* 898 P.2d 33, 36 (Colo.1995). Moreover, the People bear the burden of proving that the suppressed evidence should have been admitted under the independent source exception or the attenuation exception. *See People v. Padgett,* 932 P.2d 810, 816 (Colo. 1997); *Thomas,* 839 P.2d at 1180. We find that the People have not met this burden.

### A. Out–of–Court Identification

The People argue that the trial court erred in suppressing Fleming's out-of-court identification of the defendant as a fruit of the poisonous tree. Specifically, the People argue that the independent source exception to the fruit of the poisonous tree doctrine applies in the instant case. We disagree.

■ Under the independent source exception, unconstitutionally obtained evidence may be admitted if the prosecution can establish that it was also discovered "by means *wholly independent* of any constitutional violation." *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (emphasis added); *see also Silverthorne Lumber Co.,* 251 U.S. at 392, 40 S.Ct. 182; *Schoondermark,* 759 P.2d at 718.

Colorado case law regarding the independent source doctrine illustrates the parameters of this exception. The court of appeals first addressed the application of the independent source exception to out-of-court identifications in *People v. Marez,* 916 P.2d 543 (Colo.App.1995). *Marez* is factually analogous to the instant case insofar as it too involved a motel room seizure where the police found a gun and conducted a show-up identification outside a motel. *See id.* at 547. Notably, *Marez* held that an independent source existed for the show-up identification because: (1) the actual identity and location of the defendant was known to the police prior to the Fourth Amendment violation because the witnesses and the defendant had prior dealings; and (2) the witnesses were

able to make contemporaneous observations at the scene of the criminal activity, upon which to base their identifications of the defendant. *See id.*

Here, the trial court suppressed Fleming's out-of-court identification as a fruit of the poisonous tree because the defendant was present for the 7–Eleven employees' viewing as the direct result of an unconstitutional seizure. The trial court found that Fleming's observations of the defendant during the course of the robbery, standing alone, were not a sufficient grounds for application of the independent source exception.

On appeal, however, the People argue that we should apply an amalgam of the *Marez* independent source standard for *out-of-court* identifications and the independent source standard for *in-court* identifications. *See People v. Suttles,* 685 P.2d 183 (Colo.1984) (reversing suppression of *in-court* identification and remanding with direction that witness' recollections alone could constitute an independent source). Specifically, the People argue that Fleming's identification of the defendant at the 4–U Motel meets the two-part independent source test enunciated in these cases because: (1) Fleming had had an opportunity to observe the defendant during the robbery; and (2) Fleming was known to the police independently of the defendant's illegal arrest. Since all eye-witnesses that police bring to view a line-up are known to the police, in essence, the People argue that Fleming's recollections and observations at the time of the robbery were a sufficient independent source to distance the parking lot identification from the taint of the illegal seizure.

■ However, the People's argument erroneously collapses the Fourth Amendment standard applicable to out-of-court show-up identifications with the standard applicable to in-court identifications. These standards differ because of the different justifications for the defendant's presence at these two kinds of identification procedures. In an in-court identification, the defendant is present in the courtroom in accordance with a legal process. Thus, there is no need to ask whether the defendant is present in the

courtroom as the direct result of a violation of the Fourth Amendment. *See United States v. Crews*, 445 U.S. 463, 474–75, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (rejecting challenge to defendant's presence at trial because the defendant "is not himself a suppressible 'fruit'" of his illegal arrest); *Suttles*, 685 P.2d at 189. In cases involving in-court identifications, a witness' independent recollections from the commission of the offense alone provide a sufficient independent source for the in-court identification. *See, e.g., United States v. Wade*, 388 U.S. 218, 240, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Huguley v. People*, 195 Colo. 259, 261–62, 577 P.2d 746, 747 (1978).

■ In contrast, a defendant who is subjected to an out-of-court show-up identification is present for viewing as the direct result of the illegal seizure. *See Crews*, 445 U.S. at 475–76, 100 S.Ct. 1244 (distinguishing case where police knew defendant's identity and suspected him of criminal involvement before occurrence of Fourth Amendment violation from case where defendant's identity and connection to the illicit activity were only first discovered through an illegal arrest or search); *Davis v. Mississippi*, 394 U.S. 721, 722–23, 724, 726, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (suppressing fingerprint evidence gathered without probable cause because defendant never would have become a suspect were it not for his illegal detention).

As such, the proper inquiry in the instant case is whether there was an independent basis for the defendant's *presence* at the show-up identification. Absent satisfaction of this first inquiry, the witness' recollections cannot constitute an independent source. *See, e.g., People v. Briggs*, 709 P.2d 911, 923 (Colo.1985) (citing *Nix*, 467 U.S. at 459, 104 S.Ct. 2501 (Brennan, J., dissenting) for proposition that the "independent source" exception is one which "allows the prosecution to use evidence only if it was, in fact, obtained by fully lawful means"). In the instant case, it was Watson's unlawful entry that led directly to his observation of four black males who fit a vague description, which observation in turn resulted in the immediate detention and show-up identification in which the defendant was identified. The record does not include evidence of any alternate independent basis which would have allowed the police to secure the defendant's presence at the show-up identification, absent his illegal seizure at the Motel.

■ The People's argument mischaracterizes the second-prong of the independent source exception as it applies to out-of-court identifications. The officers' knowledge of *Fleming's identity* simply does not meet the second-prong of the independent source test for out-of-court identifications. In essence, the People urge us to find that a witness' observations at the scene of the crime alone constitute an independent source for an out-of-court identification. However, the preeminent legal treatise on search and seizure law has expressly rejected the validity of this argument, to wit:

> Of course the first identification by the witness involves her recollections and observations at the time of the robbery, for otherwise there would be no identification, but it also involves matching that recollection against the person who is before her, *a comparison which is possible only because of the illegal arrest.* ... The court in [this case] apparently went astray by confusing evidence of pretrial identification with actual identification at trial, where (as discussed below) a different approach is warranted.

5 LaFave, *Search and Seizure* § 11.4(g), at 310 (emphasis added). Were we to adopt the People's argument, all out-of-court identifications would be admissible, regardless of any police misconduct. As the interpretation the People urge us to adopt would swallow the rule, we find that the trial court correctly suppressed Fleming's out-of-court identification of the defendant as a fruit of his unconstitutional seizure.

## B. *Admissibility of the Confession*

Having concluded that probable cause was not present and that no independent source justified Fleming's out-of-court identification, we need only determine whether the circumstances of this case merit application of the attenuation exception to the defendant's statements. Should the People fail to prove that "the connection between the initial ille-

gality and the evidence has become so attenuated as to dissipate the taint," the evidence must be suppressed. *See Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Thomas,* 839 P.2d at 1180; *Schoondermark,* 759 P.2d at 718.

 In the absence of a finding of probable cause, the People concede that *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), governs the instant case. Before addressing the parameters of the attenuation doctrine, the *Brown* Court settled some confusion regarding the proper role to be played by the voluntariness of statements under the Fourth Amendment and the Fifth Amendment respectively. Therein, the Court stated that "[t]he exclusionary rule, ... when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth." *Brown,* 422 U.S. at 601, 95 S.Ct. 2254. To this end, the Court held that the fact that statements were made pursuant to an otherwise valid, voluntary waiver following *Miranda* warnings does not necessarily purge the taint of an underlying Fourth Amendment violation, such as an illegal arrest.[18] *See id.* at 603, 605, 95 S.Ct. 2254; *see also Dunaway,* 442 U.S. at 216–17, 99 S.Ct. 2248; *People v. Madson,* 638 P.2d 18, 33 (Colo.1981); *McCall,* 623 P.2d at 398. Consequently, voluntariness for purposes of the Fifth Amendment only serves as a "threshold requirement" for Fourth Amendment analysis. *See Brown,* 422 U.S. at 604, 95 S.Ct. 2254; *see also Dunaway,* 442 U.S. at 217, 99 S.Ct. 2248; *Harris,* 762 P.2d at 658.

 Beyond this threshold requirement, *Brown* identified the relevant inquiry

as whether the defendant's statements were obtained by *exploitation of the illegality* of his arrest. *See Brown,* 422 U.S. at 600, 95 S.Ct. 2254 (emphasis added) (citing *Wong Sun,* 371 U.S. at 488, 83 S.Ct. 407). The general parameters of the attenuation doctrine were well settled prior to the *Brown* decision. Under this doctrine, evidence is admissible if the prosecution shows that any connection between official illegality and the prosecution's evidence has "become so attenuated as to dissipate the taint." *See Wong Sun,* 371 U.S. at 491, 83 S.Ct. 407 (quoting *Nardone,* 308 U.S. at 341, 60 S.Ct. 266); *see also Jones,* 828 P.2d at 800. With respect to a defendant's statements, in particular, "[b]reaking the causal chain requires a showing that the confession not only meets the constitutional standards of voluntariness but also is 'sufficiently an act of free will to purge the primary taint' of the illegal arrest." *Brown,* 422 U.S. at 602, 95 S.Ct. 2254; *see also Jones,* 828 P.2d at 800; *McCall,* 623 P.2d at 403.

 Beyond these general parameters, *Brown* specifically identified several factors which courts must consider in conjunction with the threshold voluntariness requirement when determining whether a confession is obtained by exploitation of an illegal arrest: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant." *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254 (citations and footnote omitted); *see also Dunaway,* 442 U.S. at 218, 99 S.Ct. 2248; *Harris,* 762 P.2d at 659.[19]

18. The Supreme Court in *Brown v. Illinois,* 422 U.S. 590, 603, 605, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), held that the mere giving of "Miranda warnings, alone and per se, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited."

19. In *Brown,* the Court concluded that the confession was inadmissible because there was "no intervening event of significance" between the arrest and the confession, and that the arrest without probable cause had a "quality of pur-

posefulness" because it was an expedition for evidence admittedly undertaken "in the hope that something might turn up." 422 U.S. at 604–05, 95 S.Ct. 2254; *see McCall v. People,* 623 P.2d 397, 403 (Colo.1981).

In *People v. Harris,* 762 P.2d 651 (Colo.1988), the Colorado counterpart to *Brown,* the defendant was taken into custody under an order for non-testimonial identification evidence. En route to the hospital where fluid and hair samples were to be taken, the defendant made inculpatory statements in response to queries posed by a police officer. We found that the officer's questions constituted an illegal expansion of the defendant's detention under the non-testimonial evidence order and suppressed the defendant's

■ This three-prong test is not one which lends itself to exacting precision because the "question of attenuation inevitably is largely a matter of degree." *Brown*, 422 U.S. at 609, 95 S.Ct. 2254 (Powell, J., concurring); *see also* 5 LaFave, *Search and Seizure* § 11.4(b), at 257. Nevertheless, an examination of case law and relevant commentary provides welcome guidance regarding the parameters of the three relevant factors under *Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254. The first factor, temporal proximity, is the least determinative factor involved. *See* 5 LaFave, *Search and Seizure* § 11.4(b), at 259. The *Brown* Court spoke to the second factor, the presence of intervening circumstances, by citing *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972). *See Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254. In *Johnson*, the Court found that intervening circumstances existed where, prior to a lineup, the defendant was represented by counsel, and was brought before a magistrate who advised him of his rights and set bail. *Johnson*, 406 U.S. at 365, 92 S.Ct. 1620. Other frequently recognized intervening circumstances include: termination of the illegal custody,[20] the arrestee's intervening lawful arrest, and consultation with counsel. *See* 5 LaFave, *Search and Seizure* § 11.4(b), at 263–64. According to LaFave, *Johnson* does not "mean that merely turning the arrestee over to different officers, who were not involved in the arrest and perhaps are unaware of its illegality," is sufficient to satisfy the requirements of the attenuation exception. *Id.* § 11.4(b), at 265.

In regard to the voluntariness of the defendant's statements, the trial court found that the defendant had been adequately advised of his *Miranda* rights. Furthermore, as Fifth Amendment voluntariness was not the basis for the trial court's suppression of the defendant's statements, we may not address this issue at this time.

■ Therefore, we are left with the question of whether the attenuation exception applies. After applying the three-prong *Brown* test, the trial court held that the defendant's statements were not "so attenuated as to dissipate the taint" of his illegal arrest. The trial court cited the following factors as being most relevant: (a) that the police took the defendant from the Motel to a holding cell in the police station where he was confined until the interrogation began; (b) that the time between the illegal arrest and the statement was less than nine hours; (c) that despite the fact that the defendant was shirtless and shoeless in a cold cell, the police offered him neither a blanket nor other clothing until mid-way through the interrogation; and (d) that the defendant did not consult with a lawyer or with anyone else during the period he was detained. The trial court concluded that "no circumstance [had] intervened to attenuate the effect of the illegal arrest." Furthermore, the trial court found that the "police conduct was over zealous, if not flagrant" because it "consisted essentially of an illegal search of the motel room and seizure of the defendant with nothing to justify these actions but reasonable suspicion."

Notably, the People limit their appeal of the trial court's attenuation holding to the second prong of the *Brown* analysis, alleging that the trial court's finding of no intervening circumstances was in error. The People argue that, "[b]etween the time of the initial detention of the Defendant and the time of the interview, there were a number of intervening factors," including: the identification of the defendant by an eye-witnesses; the movement of the defendant from the Motel to the police department; the fact that the defendant was given the opportunity to sleep before being interrogated; the fact that the interview was conducted by a detective in plain clothes who had not been involved in the initial search, seizure and arrest; and, the fact that the opening portions of the interrogation, the part closest in time to any initial illegality, were filled with repeated

statements. *See Harris*, 762 P.2d at 659. Because no intervening event broke the causal connection between the police illegality and the defendant's statements, this court held that the

illegality was not dissipated. *See id.* (citing *McCall*, 623 P.2d at 404).

20. *See Wong Sun v. United States*, 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

denials of criminal activity. Significantly, the People cite no legal authority in support of their assertion that these events rise to the level of intervening circumstances under *Brown.*

As noted above, section IV(A) *supra,* Fleming's out-of-court identification of the defendant is inadmissible because it was the fruit of the defendant's illegal seizure. Therefore, we cannot consider whether this identification was an intervening circumstance under *Brown.* Similarly, we note that the People mischaracterize the breadth of the second prong of the *Brown* analysis when they urge us to consider events which occurred "[b]etween the time of the *initial detention* of the Defendant and the time of the interview." The proper inquiry under *Brown* is whether any attenuating events intervened between the *arrest* and the interview. *See Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254.

As the People only challenge whether intervening circumstances were present, we limit our review accordingly. Under the facts of this case, we find that the People have not satisfied their burden under *Brown* because *the causal chain between the illegal arrest and confession* was not broken by any intervening event. In fact, once Fleming's *out-of-court identification* is eliminated from consideration, it is clear that "there was no intervening event of significance whatsoever." *Brown,* 422 U.S. at 604, 95 S.Ct. 2254. Lewis remained in custody from the time of his arrest until his interrogation. He was neither taken before a magistrate, nor did he meet with counsel. Other factors cited by the People are nothing more than routine pre-interrogation procedures or behaviors. All defendants are transported from the scene of the crime to the police department following arrest. Defendants are commonly interviewed by detectives who were not involved in the initial Fourth Amendment violation. *See* 5 LaFave, *Search and Seizure* § 11.4(b), at 265 n. 162 (noting that acceptance of this as an intervening circumstance under *Brown* would enable police to violate the Fourth Amendment by dividing into two units –one composed of officers who would make illegal arrests but who would not interrogate, and the other composed of officers who would interrogate but not arrest). The

final factors cited by the People—Lewis' initial denial of any involvement in the crime during the opening portions of the interrogation and the fact that Lewis happened to fall asleep in the holding cell –both speak to the voluntariness of Lewis' confession. As noted above, the voluntariness inquiry is merely a threshold inquiry; it is not interchangeable with the attenuation inquiry.

Given the absence of any significant attenuating circumstances between the time of the defendant's illegal arrest and his statements to the police, we affirm the trial court's suppression of the defendant's statements as the fruit of an illegal arrest. *See Wong Sun,* 371 U.S. at 486, 83 S.Ct. 407.

## V.

In view of the district court's findings of fact and the evidentiary record here, we conclude that the trial court was correct in suppressing the evidence and statements gathered as a result of this nonconsensual and invalid entry. Accordingly, we affirm the trial court's suppression of evidence, the out-of-court identification, and defendant's statements.